**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------X

Case No.:

ALKEISHA BROWN,

Plaintiff,

**COMPLAINT**

-against-

**PLAINTIFF DEMANDS A TRIAL BY JURY**

CENTENE CORPORATION, CENTENE MANAGEMENT COMPANY LLC, NEW YORK QUALITY HEALTHCARE CORPORATION d/b/a FIDELIS CARE, ANNE-MARIE COLELLA, *Individually*, and CAREY SHOEMAKER, *Individually*,

Defendants.

---------------------------------------------------------------------X

Plaintiff, ALKEISHA BROWN, by and through her attorneys, SHEGERIAN & ASSOCIATES, APC, hereby brings this action against Defendants, upon information and belief, as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*. ("ADA"), the New York City Human Rights Law, New York City Administrative Code § 8-101, *et seq.* ("NYCHRL"), and the New York Labor Law §§ 215 and 740, and seeks damages to redress the injuries Plaintiff has suffered as a result of **discrimination** by her employer on the basis of her **race, color, and disability**, **harassment, a hostile work environment**, and **retaliation** for requesting a reasonable accommodation for her disability and opposing discrimination.

## JURISDICTION AND VENUE

2. Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 12117(a), 28 U.S.C. §§ 1331 and 1343.

3. The unlawful employment practices were committed in Queens County, Eastern District of New York, where the within alleged conduct took place.

4. The Court has supplemental jurisdiction over the claims brought under state law pursuant to 28 U.S.C. §1367.

5. Jurisdiction of this Court is also proper over this matter pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Plaintiff BROWN is a citizen of the State of New Jersey. Defendant CENTENE CORPORATION is a citizen of the State of Delaware, in which it is incorporated, and of the State of Missouri, where it has its principal place of business. Defendant CENTENE MANAGEMENT COMPANY LLC is a limited liability company and, upon information and belief, its sole member is Defendant CENTENE CORPORATION; it is therefore a citizen of the State of Delaware and of the State of Missouri.

7. Defendants NEW YORK QUALITY HEALTHCARE CORPORATION d/b/a FIDELIS CARE, ANNE-MARIE COLELLA and CAREY SHOEMAKER are citizens of the State of New York. Therefore, complete diversity exists between the parties, and this Court has subject matter jurisdiction over this action.

8. Venue is proper in this district pursuant to 28 U.S.C. §1391(b), as the Eastern District of New York is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## PROCEDURAL PREREQUISITES

9. Plaintiff filed a charge of discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC").

10. Plaintiff received a Notice of Right to Sue from the EEOC, dated June 24, 2026, with respect to the charge of discrimination. A copy of the Notice of Right to Sue is annexed hereto.

11. This Action is being commenced within ninety (90) days of receipt of said Right to Sue, and all administrative prerequisites to this action have been satisfied.

12. To the extent required by N.Y.C. Admin. Code § 8-502(c), Plaintiff has served or will serve a copy of this Complaint upon the New York City Commission on Human Rights and upon the Corporation Counsel of the City of New York.

## PARTIES

13. That at all times relevant hereto, Plaintiff ALKEISHA BROWN ("BROWN") was a resident of the State of New Jersey and the County of Gloucester.

14. That at all times relevant hereto, Defendant CENTENE CORPORATION ("CENTENE") was a foreign business corporation organized under the laws of the State of Delaware and authorized to do business in the State of New York. Defendant CENTENE's principal place of business is located at 7700 Forsyth Boulevard, St. Louis, MO 63105.

15. That at all times relevant hereto, Defendant CENTENE MANAGEMENT COMPANY LLC ("CENTENE LLC") was and is a foreign limited liability company organized under the laws of the State of Wisconsin and authorized to do business in the State of New York. Defendant CENTENE LLC's principal place of business is located at 7700 Forsyth Boulevard, St. Louis, MO 63105.

16. That at all times relevant hereto, Defendant NEW YORK QUALITY HEALTHCARE CORPORATION d/b/a FIDELIS CARE ("FIDELIS") was and is a domestic corporation authorized to operate by the State of New York and authorized to do business in the State

of New York. Defendant FIDELIS' principal place of business is located at 25-01 Jackson Avenue, Long Island City, NY 11101.

17. Upon information and belief, Defendants FIDELIS and CENTENE LLC are wholly owned subsidiaries of Defendant CENTENE CORPORATION.

18. That at all times relevant hereto, Defendants CENTENE, CENTENE LLC, and FIDELIS employed more than fifteen (15) employees.

19. Upon information and belief, at all relevant times, Defendants CENTENE, CENTENE LLC, and FIDELIS operated as joint and/or integrated employers of Plaintiff. The three entities shared or co-determined matters governing the essential terms and conditions of Plaintiff's employment, including but not limited to hiring, supervision, scheduling, payroll, and disciplinary decisions. Defendants CENTENE, CENTENE LLC, and FIDELIS maintained interrelated operations, common management, centralized control of labor relations, and a degree of common ownership or financial control, such that they functioned as a single or joint enterprise with respect to the employment of Plaintiff and similarly situated employees.

20. That at all times relevant hereto, upon information and belief, Defendant ANNE-MARIE COLELLA ("COLELLA") was an employee of Defendants CENTENE, CENTENE LLC, and FIDELIS holding the position of Senior Director of Provider Relations, and was a resident of the State of New York.

21. That at all times relevant hereto, Defendant COLELLA was Plaintiff BROWN's supervisor and/or had supervisory authority over Plaintiff BROWN.

22. That at all times relevant hereto, upon information and belief, Defendant CAREY SHOEMAKER ("SHOEMAKER") was an employee of CENTENE, CENTENE LLC, and

FIDELIS holding the position of Vice President of Provider Relations, and was a resident of the State of New York.

23. That at all times relevant hereto, Defendant SHOEMAKER was Plaintiff BROWN's supervisor and/or had supervisory authority over Plaintiff BROWN.

24. That at all times relevant hereto, Defendant CENTENE, Defendant CENTENE LLC, Defendant FIDELIS, Defendant COLELLA, and Defendant SHOEMAKER are collectively referred to herein as "Defendants."

**MATERIAL FACTS**

25. Plaintiff Brown is African American. She suffers from depression, anxiety, and post-traumatic stress disorder ("PTSD"), which substantially limit one or more major life activities.

26. At all relevant times, Plaintiff was a qualified individual with a disability who was able to perform the essential functions of the Director of Provider Relations position with or without reasonable accommodation.

27. Plaintiff was employed by Defendant Centene as a Manager of Provider Relations for the State of Pennsylvania from on or about October 8, 2018 until on or about July 14, 2024.

28. On or about July 14, 2024, Plaintiff was promoted to Director of Provider Relations and transferred to Defendants' New York City plan, known as Fidelis Care / WellCare, located in Long Island City, Queens, New York.

29. Upon information and belief, all other Directors of Provider Relations were Caucasian: Lipinoga, Deanna Stephenson, Maria Biondilillo, and Tracey Pizza. Along with Plaintiff, each reported to Defendants Shoemaker and Colella, who were also Caucasian. Plaintiff's New York City team was the only team led by an African American Director.

30. On or about August 5, 2024, Plaintiff attended her first meeting with her direct supervisor, Defendant Colella, Senior Director of Provider Relations, and Lipinoga, Director of Provider Relations for Defendant Centene's Upstate region. Rather than receiving a professional welcome or orientation, Plaintiff was immediately subjected to disparaging, unprofessional, and racially charged comments about the leadership team she had been asked to lead in Defendant Centene's Downstate region.

31. During that initial meeting, Defendant Colella referred to certain non-white managers under Plaintiff's supervision as "incompetent," referring to one manager, Jannette Perez ("Perez"), a Hispanic woman, as a "yes man" who blindly followed instructions without thinking. Plaintiff was shocked by Defendant Colella's comments.

32. On or about August 5, 2024, Lipinoga instructed Plaintiff to issue a disciplinary write-up to Gene Kwok ("Mr. Kwok"), a Chinese supervisor who reported directly to Plaintiff, and pressured Plaintiff to terminate him. When Plaintiff asked why, Lipinoga stated that management, including herself, did not like Mr. Kwok and that Plaintiff would probably dislike him as well. Lipinoga added that Mr. Kwok "doesn't like Black People." Plaintiff understood these racially charged statements as an attempt to induce her, as a Black woman, to discipline and terminate Mr. Kwok.

33. Plaintiff refused to issue the write-up and told Lipinoga that she would assess Mr. Kwok's performance herself. This was the first of Plaintiff's repeated refusals to carry out directives she reasonably believed were discriminatory and retaliatory toward non-white subordinates.

34. In retaliation, Lipinoga stopped communicating with Plaintiff and ceased training her, despite having been tasked with training Plaintiff in her new role. As a consequence, Plaintiff was never given proper training or the system access her role required.

35. Throughout August and September 2024, Defendants Shoemaker and Colella as well as Lipinoga repeatedly pressured Plaintiff to discipline and terminate Mr. Kwok. Plaintiff eventually agreed to place Mr. Kwok on a Performance Improvement Plan ("PIP").

36. In or about September 2024, Mr. Kwok successfully completed the PIP. When Plaintiff informed Defendant Shoemaker that Mr. Kwok had met all requirements and that she would not terminate him, Defendant Shoemaker called her, upset, demanding to know "what her problem was" and why she was not being a "team player." In an attempt to convince Plaintiff to terminate him, Defendant Shoemaker stated that Mr. Kwok had unfairly treated two of his direct reports because they were Black women. Plaintiff again refused to terminate him, but nonetheless agreed to place Mr. Kwok on a 30-day PIP extension following continued pressure from Defendant Shoemaker.

37. After Plaintiff again refused to terminate Mr. Kwok, Lipinoga and Defendant Colella held a conference call with Plaintiff, during which Lipinoga aggressively confronted her. When Plaintiff attempted to defend herself, she told Defendant Colella that if she responded in kind, she "would be the 'angry Black woman' and it was not okay," expressly naming the racial stereotype she understood Defendants to be applying to her. Defendant Colella responded only that Plaintiff should have followed Lipinoga's directive and fired Mr. Kwok.

38. Similarly, in or around September 2024, Defendant Shoemaker directed Plaintiff to place a Hispanic woman in the Downstate region on a PIP for allegedly missing a single provider

communication while in the field, despite her servicing hundreds of providers. Plaintiff refused. The following week, she was formally commended for exceptional performance on the same account.

39. On or about October 15, 2024, Mr. Kwok completed the extended PIP and met all expectations. When Plaintiff advised Defendant Shoemaker that she would not terminate him, Defendants Colella and Shoemaker again accused Plaintiff of failing to fall in line and of failing to be "supportive" and a "team player," and Defendant Colella refused to hear Plaintiff's explanation.

40. In or about October 2024, Plaintiff attended a Provider Relations Leadership Retreat in Buffalo, New York. Plaintiff was the only African American Director of Provider Relations in attendance.

41. At the retreat, Plaintiff was subjected to intense scrutiny and questioning by Lipinoga and Defendants Colella and Shoemaker, and by Stephenson. Defendant Colella falsely accused Plaintiff of causing numerous staff complaints to Employee Relations and demanded that Plaintiff put an end to them. Plaintiff responded that the complaints predated her arrival.

42. Also at the October 2024 retreat, Defendant Colella, in reference to a Downstate African American Manager, Ava Brewster ("Ms. Brewster"), stated to Plaintiff: "[y]ou know how you people are." Plaintiff understood the remark as racially charged and directed at African American employees, including Ms. Brewster and Plaintiff herself.

43. On October 24, 2024, Plaintiff emailed Defendants Colella and Shoemaker as well as Defendant Centene's Employee Relations, formally complaining of the harassment and injustice she experienced at the retreat. Plaintiff described withheld work, lack of support, defamation of her character, and major macroaggressions and microaggressions in the

workplace. Plaintiff stated that the treatment "left me mentally debilitated to perform at my highest level with no trainings or support." Employee Relations acknowledged the complaint and stated it would be documented, but Plaintiff received no substantive response and Defendants took no substantive corrective action.

44. On or about October 29, 2024, Plaintiff again complained in writing to Employee Relations, disputing Defendant Colella's accusation that she had caused the staff complaints. Plaintiff asked Employee Relations representative Erika Gillette ("Ms. Gillette") whether the complaints from the Downstate region were attributable to her, and Ms. Gillette confirmed that the complaints from Plaintiff's team were unrelated to Plaintiff, directly contradicting Defendant Colella.

45. On or about December 16, 2024, Plaintiff again complained in writing to Defendant Colella that she and her racially diverse Downstate team were being subjected to discriminatory treatment from the Upstate managers. Plaintiff reported that Defendant Colella repeatedly called the team "you people" and "you people from downstate" and screamed at Plaintiff on calls.

46. Thereafter, Upstate management, including but not limited to Defendant Colella, accused Plaintiff of having a "tone" and of being "aggressive" in ordinary workplace interactions, including merely asking questions — language reflecting racially gendered stereotypes commonly directed at African American women in professional settings.

47. Following Plaintiff's protected complaints, Defendants subjected her to a sustained campaign of retaliatory and discriminatory treatment not directed at her Caucasian counterparts. In addition to the disparate scrutiny and withholding of resources described above, Defendants issued Plaintiff contradictory directives and then faulted her for

following them; increased her workload while withholding the information she needed to meet it; berated and belittled her in meetings and in front of her staff; undermined her authority with her own team; and accused her of performance failures that the contemporaneous record disproves.

48. Defendants also withheld information and resources from Plaintiff that were made available to her Caucasian counterparts, leaving her to navigate complex systems and expectations alone. Throughout Plaintiff's tenure in the Downstate region, and continuing from the withdrawal of her training in August 2024 through the period in which she lacked full system access, Plaintiff's supervisors admitted on multiple occasions that they purposely withheld information from her, often stating that she "should already know," that she should already understand what was being asked of her, or that she should already know what to do with materials they had sent her.

49. Indeed, in or about late 2024, Plaintiff advised CEO Tom Halloran that she still had no system access. Mr. Halloran expressed shock, acknowledged that Plaintiff should have been trained, and secured only partial access for her. Plaintiff did not obtain full access until approximately March 2025, and she never received all required access or any formal training during her employment in the Downstate region.

50. On or about January 10, 2025, Plaintiff was asked to assist Employee Relations representative Lisa Bennett ("Ms. Bennett") and Senior Compliance Investigator Jennifer Michael with an internal investigation into the mishandling of corporate funds. During that investigation, Plaintiff confirmed that Defendant Centene had failed to pay healthcare providers money in claims dating back to 2016-2017 and reported those findings to Employee Relations and Compliance. Plaintiff also complained of prejudice and

harassment by Lipinoga and Defendants Colella and Shoemaker, and reported that the adverse treatment was retaliation for her refusal to terminate Mr. Kwok.

51. On January 21, 2025, Ms. Bennett confirmed in writing that Plaintiff's complaints of harassment, retaliation, and withholding of information were under investigation, and the matter was later reassigned to Senior People Relations Partner Felicia Marrett ("Ms. Marrett").

52. On January 31, 2025, Plaintiff submitted an HR ticket questioning whether the directed practice of requiring newly reclassified non-exempt employees to clock in and out from home before commuting to the office complied with federal and state wage-and-hour law. Lipinoga denied the practice was unlawful. Plaintiff nonetheless refused to impose it on her New York City team because she reasonably believed it violated the Fair Labor Standards Act and the New York Labor Law.

53. On or about February 11, 2025, Defendant Colella doubled meetings with Plaintiff from weekly to twice weekly. Plaintiff understands that the other Caucasian Directors of Provider Relations were not subjected to this meeting cadence.

54. On February 13, 2025, at a touch-base meeting, Defendant Colella blamed Plaintiff for her managers' alleged failure to meet expectations and recited what Plaintiff asserts were false claims. Plaintiff sent a written recap to Senior People Relations Partner Ms. Marrett and asked that the incident be added to her pending harassment and retaliation complaint.

55. On or about February 14, 2025, Plaintiff submitted a written complaint to Employee Relations and Defendant Shoemaker reporting that the ongoing hostility, harassment, retaliation, and unsafe work environment had caused her to initiate a claim with the New York City Insurance Board. Plaintiff reported that since her appointment as Director in July

2024, she had been subjected to discriminatory remarks, persistent belittling and degradation by leadership, threats of termination, and inequitable treatment compared to her Caucasian counterparts, all of which created a hostile work environment that jeopardized her mental and physical well-being. Plaintiff further reported that Defendant Colella's accusations regarding her performance were retaliation for her prior complaints to Employee Relations.

56. On or about March 10, 2025, less than one month after Plaintiff's February 14, 2025 complaint, Defendant Colella and Human Resources ("HR") Business Partner Elsa Stornella issued Plaintiff a Last Chance Agreement ("LCA"). Upon information and belief, Defendant Colella first raised performance concerns about Plaintiff to HR only after Plaintiff engaged in protected activity. The LCA was not preceded by a formal Performance Improvement Plan, coaching, or progressive discipline.

57. On or about March 11, 2025, Plaintiff submitted a written rebuttal to the LCA, disputing the false performance and conduct accusations contained therein and documenting the ongoing pattern of inadequate training, contradictory directives, directives to terminate her non-white subordinates, and the hostile work environment Defendant Colella had created.

58. The retaliatory LCA triggered a severe mental health crisis for Plaintiff, including panic attacks, uncontrolled anxiety, and an inability to sleep without medication. Plaintiff notified Senior People Relations Partner Ms. Marrett that the hostile work environment and retaliatory discipline were harming her mental health, and requested medical leave through Defendant Centene's third-party leave administrator, Lincoln Financial. Plaintiff then emailed Defendant Colella that she would be on FMLA leave for approximately eight weeks; Defendant Colella never responded.

59. From March 11, 2025, through May 7, 2025, Plaintiff took approved continuous medical leave for depression and anxiety due to the hostile work environment.

60. On or about April 17, 2025, while Plaintiff was on medical leave, Ms. Marrett told Plaintiff that her complaints against Defendant Colella were not substantiated, that the investigation was closed, and that no action would be taken, despite her acknowledging "some concerns" about Defendant Colella's treatment of Plaintiff and the Downstate team. Upon information and belief, none of the witnesses Plaintiff identified were interviewed, and the investigation was a sham designed to cover the retaliation Plaintiff had endured. Plaintiff objected and stated she would explore further action.

61. On or about May 2, 2025, Plaintiff emailed Defendants Colella and Shoemaker advising that she would return to work on May 7, 2025, and would begin intermittent leave effective that date. Neither Defendant Colella nor Defendant Shoemaker responded.

62. Thereafter, Plaintiff was approved for intermittent FMLA leave from May 6, 2025 through October 5, 2025 for her mental health diagnoses, permitting four days of leave per month.

63. Upon her return from continuous leave on or about May 7, 2025, Plaintiff reported to Defendant Shoemaker rather than Defendant Colella. Thereafter, Defendant Shoemaker subjected Plaintiff to continued retaliation and harassment, singling her out during meetings and imposing disparate scrutiny.

64. Indeed, from May 2025 onward, Defendant Shoemaker opened meetings with Plaintiff by reminding her that she remained on an LCA that would be addressed at a later time. Defendant Shoemaker also required Plaintiff to keep her camera on during virtual meetings, a requirement Plaintiff understands was not imposed on any other Director of Provider Relations, each of whom was Caucasian and did not have a disability.

65. Moreover, in or about May or June 2025, when Plaintiff asked Defendant Shoemaker directly whether she did not trust Plaintiff because Plaintiff is a Black woman, Defendant Shoemaker did not deny it, responding only, "I just don't trust you."

66. In or about June 2025, Plaintiff requested a transfer from Defendant Shoemaker. Defendant Shoemaker denied Plaintiff's request, stating that Plaintiff was on an indefinite LCA. Upon information and belief, per Defendants' own company policy, LCAs expire after 90 days.

67. On or about June 25, 2025, Defendant Shoemaker directed Plaintiff to place Downstate region managers Ms. Perez, Ms. Brewster, and supervisor Mr. Kwok on PIPs, stating that she felt they were "unfit for the job" and did not have "what it takes," without providing any supporting examples. Plaintiff escalated the directive to Employee Relations representative Isabella Hatfield, who advised monitoring rather than formal PIPs. Plaintiff placed no one on a PIP.

68. On or about July 9, 2025, upon learning that the LCA remained active despite Defendants' 90-day expiration policy, Plaintiff submitted a second written rebuttal to Employee Relations, again opposing the unwarranted discipline and asserting that the LCA had been issued in retaliation for her complaints of discrimination and inequitable treatment. Plaintiff further complained that, unlike her Caucasian and non-disabled peers, she had received little to no training or structured onboarding upon her transfer to New York and had been left to self-train, and that this disparate treatment was in retaliation for her advocacy for fair and equitable practices.

69. On July 31, 2025, Plaintiff requested continuous FMLA leave to care for her mother, who had previously been diagnosed with stage-4 cancer. Plaintiff emailed Defendant Shoemaker regarding this leave request that same day.

70. On August 1, 2025, just one day after Plaintiff's request for FMLA caregiver leave, and just twenty-three days after Plaintiff's second written rebuttal opposing the unwarranted LCA, Defendants terminated Plaintiff's employment, citing the unwarranted discipline and false performance deficiencies that Plaintiff had repeatedly disputed.

71. Plaintiff BROWN alleges that the foregoing allegations represent only a portion of the discriminatory and retaliatory conduct perpetrated by Defendants. These examples are not exhaustive. The unlawful conduct by Defendants was ongoing, continuous, and part of a persistent pattern of behavior that created and sustained a hostile and retaliatory environment for Plaintiff.

72. Defendants' actions and conduct were and are intentional and intended to harm Plaintiff BROWN.

73. Plaintiff BROWN has been unlawfully discriminated against, humiliated, and degraded, and as a result, suffers loss of rights, emotional distress, and loss of income and earnings.

74. As a result of Defendants' actions, Plaintiff BROWN feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

75. As a result of the acts and conduct complained of herein, Plaintiff BROWN has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiff BROWN has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

76. Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff BROWN demands Punitive Damages as against all Defendants, jointly and severally.

**AS A FIRST CAUSE OF ACTION FOR DISCRIMINATION**
**UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**For Harassment and Hostile Work Environment**
(Not Against Individual Defendants)

77. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

78. Plaintiff claims Defendants violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), when Defendants discriminated against Plaintiff on the basis of her race and color and subjected her to a hostile work environment.

79. Title VII, 42 U.S.C. § 2000e-2(a)(1), states: "It shall be an unlawful employment practice for an employer -- (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

80. Defendants engaged in an unlawful discriminatory practice by discriminating against and creating a hostile work environment for Plaintiff BROWN because of her race and color.

81. As such, Plaintiff BROWN has been damaged as set forth herein.

**AS A SECOND CAUSE OF ACTION FOR DISCRIMINATION**
**UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**For Disparate Treatment**
(Not Against Individual Defendants)

82. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

83. Plaintiff claims Defendants violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), when Defendants discriminated against Plaintiff on the basis of her race and color.

84. Title VII, 42 U.S.C. § 2000e-2(a)(1), states: "It shall be an unlawful employment practice for an employer -- (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

85. Defendants engaged in an unlawful discriminatory practice by subjecting Plaintiff to disparate treatment on the basis of her race and color.

86. As such, Plaintiff BROWN has been damaged as set forth herein.

**AS A THIRD CAUSE OF ACTION FOR RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

(Not Against Individual Defendants)

87. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

88. Plaintiff claims Defendants violated Title VII when they retaliated against Plaintiff for opposing race discrimination, color discrimination, harassment, and inequitable treatment.

89. Title VII, 42 U.S.C. § 2000e-3(a), states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

90. Defendants engaged in unlawful retaliatory practice by retaliating against Plaintiff BROWN because she complained against and opposed the discrimination to which Defendants subjected her.

91. As such, Plaintiff BROWN has been damaged as set forth herein.

**AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION**
**UNDER THE AMERICANS WITH DISABILITIES ACT**
**For Harassment and Hostile Work Environment**
(Not Against Individual Defendants)

92. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

93. Plaintiff claims Defendants violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336) ("ADA"), as amended and codified at 42 U.S.C. § 12101 et seq., when Defendants discriminated against Plaintiff on the basis of her disability.

94. Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112, Discrimination [Section 102] states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

95. Defendants engaged in an unlawful discriminatory practice by subjecting Plaintiff BROWN, a qualified individual with a disability, to disability-based harassment and a hostile work environment because of her disability and her use of disability-related leave.

96. As such, Plaintiff BROWN has been damaged as set forth herein.

**AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION**
**UNDER THE AMERICANS WITH DISABILITIES ACT**
**For Disparate Treatment**
(Not Against Individual Defendants)

97. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

98. Plaintiff claims Defendants violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336) ("ADA"), as amended and codified at 42 U.S.C. § 12101 et seq., when Defendants discriminated against Plaintiff on the basis of her disability.

99. Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112, Discrimination [Section 102] states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

100. Defendants engaged in an unlawful discriminatory practice by subjecting Plaintiff BROWN, a qualified individual with a disability, to disparate terms and conditions of employment, discipline, denial of transfer, and termination because of her disability and Defendants' perception of her disability. Similarly situated Directors of Provider Relations without disabilities were not so treated.

101. As such, Plaintiff BROWN has been damaged as set forth herein.

**AS A SIXTH CAUSE OF ACTION FOR RETALIATION UNDER THE AMERICANS WITH DISABILITIES ACT**
(Not Against Individual Defendants)

102. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

103. Plaintiff alleges Defendants further violated the ADA when Defendants retaliated against her for requesting a reasonable accommodation for her disability and complaining of the ongoing discrimination on the basis of her disability.

104. The ADA as amended and codified at 42 U.S.C. § 12203(a), states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice

made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

105. Defendants engaged in unlawful retaliatory practice by retaliating against Plaintiff BROWN because she complained against the discrimination she suffered and for requesting a reasonable accommodation for her disability.

106. As such, Plaintiff BROWN has been damaged as set forth herein.

## AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION ON THE BASIS OF RACE AND COLOR UNDER 42 U.S.C. § 1981

107. Plaintiff BROWN repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

108. Plaintiff BROWN is a member of a protected class due to her African American race and dark colored skin.

109. Section 1981 prohibits direct or indirect acts of exclusion, distinction, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference in the treatment of a person or persons because of race, creed, color, religion, sex, age, or national origin in employment and contracting settings.

110. Defendants discriminated against Plaintiff BROWN because of her African American race and dark colored skin, as alleged further above.

111. As a direct and proximate result of Defendants' willful, knowing, and intentional discriminatory actions, Plaintiff BROWN was injured and suffered and continues to suffer from substantial loss of earnings and other employment benefits, as well as humiliation,

emotional distress, mental and physical pain and anguish, and other damages because of Defendants' illegal termination of her employment.

112. Defendants' conduct also caused Plaintiff BROWN to suffer punitive damages, as well as attorneys' fees, costs and expenses.

**AS AN EIGHTH CAUSE OF ACTION FOR DISCRIMINATION ON THE BASIS OF RACE AND COLOR UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

113. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

114. The New York City Administrative Code §8-107(1) provides that "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

115. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(1)(a) by discriminating against Plaintiff by subjecting her to disparate treatment and a hostile work environment and terminating her employment because of her race and/or color.

116. As such, Plaintiff BROWN has been damaged as set forth herein.

**AS A NINTH CAUSE OF ACTION FOR DISCRIMINATION ON THE BASIS OF DISABILITY UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

117. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

118. The New York City Administrative Code §8-107(1) provides that "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

119. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(1)(a) by discriminating against Plaintiff by subjecting her to disparate treatment and a hostile work environment and terminating her employment because of her disability and need for a reasonable accommodation.

120. As such, Plaintiff BROWN has been damaged as set forth herein.

**AS A TENTH CAUSE OF ACTION FOR AIDING AND ABETTING UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
(Against All Individual Defendants)

121. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

122. The New York City Administrative Code §8-107(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

123. Defendants Shoemaker and Colella knowingly or recklessly aided and abetted the unlawful employment practices, including discrimination, harassment, and retaliation against Plaintiff in violation of the NYCHRL.

**AS AN ELEVENTH CAUSE OF ACTION FOR RETALIATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

124. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

125. The New York City Administrative Code §8-107(7) provides that it shall be an unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

126. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(7) by discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer, her requests for reasonable accommodation, and her use of protected medical leave.

127. Defendants violated the section cited herein as set forth.

**AS A TWELFTH CAUSE OF ACTION FOR EMPLOYER LIABILITY UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

128. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

129. The New York City Administrative Code §8-107(13) provides "Employer liability for discriminatory conduct by employee, agent or independent contractor," as follows:

a. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

1. the employee or agent exercised managerial or supervisory responsibility; or

2. the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

3. the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

c. An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

130. Defendants violated the section cited herein as set forth.

**AS A THIRTEENTH CAUSE OF ACTION FOR WHISTLE-BLOWER RETALIATION UNDER NEW YORK LABOR LAW § 740**

131. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

132. Plaintiff BROWN reasonably believed that Defendants' wage-and-hour operations violated local, state, and/or federal law, including the Fair Labor Standards Act and the

New York Labor Law, and she repeatedly objected and protested about illegal conduct to her supervisors and otherwise refused to participate in the illegal conduct.

133. Plaintiff afforded Defendants a reasonable opportunity to correct the practice through her January 31, 2025 HR ticket questioning whether requiring newly reclassified non-exempt employees to clock in and out from home before commuting to the office complied with federal and state wage-and-hour law. Lipinoga instead denied that the practice was unlawful.

134. Defendants engaged in a pattern of retaliatory conduct toward Plaintiff BROWN.

135. On the heels of those complaints, Plaintiff BROWN was terminated for false and pretextual reasons.

**AS A FOURTEENTH CAUSE OF ACTION FOR WHISTLE-BLOWER RETALIATION UNDER NEW YORK LABOR LAW § 215**

136. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

137. At all times relevant herein, New York Labor Law § 215, *et seq.*, was in full force and effect and binding on Defendants. New York Labor Law § 215(1)(a)(i) prohibits employers, their agents, and the officers or agents of any corporation, partnership, or limited liability company from discharging, threatening, penalizing, or otherwise discriminating or retaliating against any employee for engaging in protected activity, which includes activity undertaken "because such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, or to the attorney general or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter, or any order issued by the commission."

138. An employer engaging in discrimination or retaliation against an employee because such employee used any legally protected absence pursuant to federal, local, or state law constitutes a violation of New York Labor Law § 215(1)(a)(vii).

139. Defendants engaged in discriminatory and retaliatory actions against Plaintiff BROWN, including, but not limited to, repeated discipline, threats of discipline, and ultimately termination, in response to Plaintiff's use of legally protected absences in connection with her medical leave, intermittent leave, and complaints regarding Defendants' wage and hour practices, including Plaintiff BROWN's written complaint questioning whether Defendants' directive requiring newly reclassified non-exempt employees to clock in and out from home before commuting to the office complied with federal and state wage and hour law, and Plaintiff BROWN's refusal to impose that practice on her New York City / Downstate team because she reasonably and in good faith believed it violated the Fair Labor Standards Act and the New York Labor Law.

140. As a proximate result of Defendants' retaliatory conduct, Plaintiff BROWN has suffered and continues to suffer severe emotional distress.

141. As a proximate result of Defendants' retaliatory conduct, Plaintiff BROWN has sustained and continues to sustain substantial losses of earnings, including but not limited to, loss of past and future income, and other employment benefits, for which she is entitled to an award of monetary damages and other relief.

142. As a proximate result of Defendants' retaliatory conduct and violation of New York Labor Law § 215, Plaintiff BROWN is entitled to liquidated damages of up to twenty thousand dollars ($20,000), in addition to lost compensation, damages, reasonable attorneys' fees, and costs, pursuant to New York Labor Law § 215(2)(a).

143. As a proximate result of Defendants' violation of NYLL § 215, Plaintiff BROWN has incurred, and continues to incur, legal expenses and attorneys' fees. Plaintiff BROWN is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

## JURY DEMAND

144. Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII, 42 U.S.C. § 1981, the ADA, and the NYCHRL by discriminating against and harassing Plaintiff on the basis of her race, color, and disability, subjecting her to a hostile work environment and retaliating against her for complaining of discrimination and requesting reasonable accommodation;

B. Awarding Plaintiff damages for all lost wages and benefits resulting from Defendants' unlawful discrimination and retaliation, and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action; and

///

///

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

Dated: New York, New York
September 21, 2026

**SHEGERIAN & ASSOCIATES, APC**

By: [signature]

Phillip J. Basch, Esq.
*Attorneys for Plaintiff*
90 Broad Street Suite 804
New York, NY 10004
(332) 209-4097
pbasch@shegerianlaw.com

# Exhibit 1

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 06/24/2026

**To:** Ms. AlKeisha Brown
171 Lincoln Road
Wenonah, NJ 08090
Charge No: 520-2026-06097

EEOC Representative and email: GEORGIA JOHANSEN
INVESTIGATOR
GEORGIA.JOHANSEN@EEOC.GOV

---

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 520-2026-06097.

On behalf of the Commission,

Digitally Signed By:Arlean Nieto
06/24/2026

Arlean Nieto
Acting District Director